Sana Chaudhry (N.Y. Bar No. 5284807)
Eli R. Freedman (Cal. Bar No. 345432)
Evan Mendelson (D.C. Bar No. 996765)
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington DC 20580
(202) 326-2679; schaudhry@ftc.gov
(202) 326-2030; efreedman@ftc.gov
(202) 326-3320; emendelson@ftc.gov

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br><br>        v.<br><br>CHEGG, INC., a corporation,<br><br>    Defendant. | Case No. _____<br><br>**COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF** |

Plaintiff, the Federal Trade Commission, alleges:

1.      Plaintiff brings this action for Defendant's violations of the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8403.  For these violations, Plaintiff seeks relief, including a permanent injunction, monetary relief, and other relief, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b), 57b, and Section 5 of ROSCA, 15 U.S.C. § 8404.

## SUMMARY OF THE CASE

2.      Defendant Chegg, Inc. ("Chegg") is an educational technology company that markets and sells various educational products and services through its websites, primarily to high school and college students.  Among other things, Chegg sells and rents digital and physical textbooks to students and offers a variety of online subscription services, including study tools, homework help, and writing assistance.

3.     For years, Defendant has failed to provide subscribers a simple mechanism to cancel recurring charges.  Even after consumers managed to navigate Chegg's lengthy cancellation processes and believe they have successfully cancelled their subscriptions, in many instances, Chegg continues to charge them.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355.

5.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1), (b)(2), (c)(2), and (d), 1395(a), and 15 U.S.C. § 53(b).

## PLAINTIFF

6.     The FTC is an agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces ROSCA, 15 U.S.C. §§ 8401-8405, which prohibits the sale of goods or services on the Internet through negative option marketing without meeting certain requirements for disclosure, consent, and cancellation to protect consumers.  A negative option is an offer in which the seller treats a consumer's silence—*i.e.*, their failure to reject an offer or cancel an agreement—as consent to be charged for goods and services.  16 C.F.R. § 310.2(w).

## DEFENDANT

7.     Defendant Chegg is a Delaware corporation with its principal place of business at 3990 Freedom Circle, Santa Clara, California.  Chegg transacts or has transacted business in this District and throughout the United States.  At all times relevant to this Complaint, acting alone or in concert with others, Chegg has advertised, marketed, distributed, or sold products and services to consumers throughout the United States.

8.      Chegg owns and operates several websites, directly and through its wholly-owned subsidiaries, including Mathway LLC and Thinkful, Inc.

## COMMERCE

9.      At all times relevant to this Complaint, Defendant has maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANT'S BUSINESS ACTIVITIES

10.      Chegg operates multiple online platforms that offer educational products and subscription services.  During the times relevant to this Complaint, Chegg's subscription offerings have included Chegg Study, Chegg Study Pack, Chegg Writing, Chegg Math Solver, Mathway, BibMe, EasyBib, Citation Machine, Cite This For Me, and Busuu.

11.      Chegg also sells and rents physical and digital textbooks.

12.      In addition, Chegg operates Chegg Skills (formerly, Thinkful), an online platform that offers a variety of courses and programs marketed for developing technological skills.

13.      Chegg markets and sells its offerings through its own websites and on third-party app stores.

## I.    Chegg's Unlawful Negative Option Cancellation Practices

14.      Chegg markets, offers, and sells several subscription services through its websites, including www.chegg.com, www.bibme.org, www.citationmachine.net, www.citethisforme.com, www.easybib.com, and www.mathway.com.

15.      Consumers who enroll in Chegg's subscription services continue to have their subscriptions renewed and are charged until they affirmatively act to cancel their subscriptions.

16.      Chegg provides subscribers with two methods to cancel their subscriptions: (i) through online self-cancellation, and (ii) by contacting customer service via online chat, phone, email, or social media.

17.    Neither method provides consumers a simple mechanism to cancel their subscriptions.

18.    Most Chegg subscribers have the option to self-cancel their subscriptions online at chegg.com.

19.    However, to cancel a subscription on chegg.com, subscribers must first locate the option to self-cancel.  Until recently, Chegg buried the cancellation option, requiring consumers in many instances to navigate through several pages to even find and initiate the self-cancellation process.

20.    For example, consumers must first sign in and navigate to the "My Account" page to manage their account.

21.    Subscribers who reached "My Account" land on the "Overview" tab of the account management page.



22.    The Overview tab had no cancellation button or hyperlink.  Nor did this tab contain any text directing consumers to the cancellation process.  Instead, to proceed with cancellation, consumers needed to click on either the "Orders" option in the top menu bar or the "Order" they wished to cancel.

23.    Clicking on one of these options brought consumers to the "Orders" tab.  The Orders tab had one or more prominent orange buttons, none of which initiated cancellation.  Instead, consumers had to find and click on the less prominent "Cancel subscription" hyperlink to proceed.



24.    Until around January 2023, the cancellation hyperlink was not available to consumers using a mobile web browser to self-cancel.  At the time, Chegg instructed consumers to cancel by logging into "My Account" using a desktop or laptop computer.

25.    Clicking the "Cancel subscription" hyperlink does not, however, cancel the subscription.

26.    Until around September 2024, Chegg Study subscribers who clicked on "Cancel subscription" were directed to a "flow" requiring several additional steps to complete cancellation.

27.    The flow to cancel Chegg Study began with a coupon page, which contained a large headline "Give us another shot" and offered a one-month discount to discourage cancellations.

1

2

3

4

5

6

7

8

9



10

11    28.    The bottom of the coupon page displayed a large orange "Keep subscription"

12  button and a visually less prominent "Continue cancellation" hyperlink.  Selecting "Keep

13  subscription" terminated the cancellation process.

14    29.    Clicking the "Continue cancellation" hyperlink did not complete cancellation.

15  Instead, it navigated subscribers to a pause page.  On this page, Chegg offered subscribers the

16  option to pause their subscription for up to three months, rather than cancelling.  Chegg pre-

17  selected a one-month pause by default.

18

19

20



21

22

23

24

25

26    30.    The bottom of the pause page displayed an orange "Pause subscription" button

27  and a blue "I'd rather cancel" hyperlink.  Selecting "Pause subscription" terminated the

28

cancellation process.  Subscribers were required to select "I'd rather cancel" to proceed with cancelling.

31.    Clicking the "I'd rather cancel" hyperlink did not complete cancellation.  Rather, it directed subscribers to a survey page.  The survey page asked subscribers why they were cancelling.



32.    The bottom of the survey page, unlike the prior pages in the flow, displayed an orange "Continue" button and a blue "Keep my subscription" hyperlink.  Selecting "Keep my subscription" terminated the cancellation process.

33.    The "Continue" button on the survey page was greyed out until the subscriber provided at least one cancellation reason.  After providing a cancellation reason, subscribers could click "Continue" to proceed with cancelling.

34.    Clicking the "Continue" button did not complete cancellation.  Instead, it brought consumers to a perks page.  The page contained a prominent "We're sad to see you go!" headline above a display of various tools and perks to which consumers would lose access if they cancelled.



35.     The bottom of the page displayed an orange "Cancel subscription" button and a blue "Keep my subscription" hyperlink.  Selecting "Keep my subscription" terminated the cancellation process.

36.     Subscribers who reached the perks page and clicked "Cancel subscription" finally completed the cancellation process.

37.     Until July 2024, consumers using mobile web browsers to cancel could not see the "Cancel subscription" button on the perks page without scrolling down.




38.　　Like the Chegg Study flow described in Paragraphs 19 to 36, until July 2024, subscribers cancelling Chegg Study Pack subscriptions also had to navigate through a lengthy process to cancel—starting with locating the "Cancel subscription" hyperlink on the account page and requiring several additional steps, including a survey.  Further, depending on the response selected in the survey, some subscribers were redirected to a "downgrade" flow offering to switch them to a Chegg Study subscription.

39.　　Consumers cancelling Chegg Writing and the now-discontinued Chegg Math Solver subscriptions are/were similarly required to begin cancellation by locating Chegg's buried cancellation option, as described in Paragraphs 19 to 25.

40.　　At all times during the relevant period, consumers were unable to cancel subscriptions to Chegg Writing using mobile web browsers.

41.　　Consumers cancelling subscriptions on other Chegg websites described in Paragraph 14 also encounter a lengthy cancellation process.

42.     Among these sites, only on mathway.com can consumers complete cancellation from start to finish.  The remaining sites—i.e., bibme.org, citationmachine.net, citethisforme.com, and easybib.com (together, "Chegg Writing Tools Sites")—require consumers to navigate to chegg.com to complete cancellation.  Further, subscribers cannot cancel subscriptions on Chegg Writing Tools Sites using mobile web browsers.

43.     For example, subscribers attempting to cancel BibMe subscriptions on bibme.org must first sign in using a desktop browser.  Subscribers must then access their account page by clicking their email address displayed in the top right corner of the page and selecting "Settings" from a drop-down menu.

44.     Clicking "Settings" navigates subscribers to a page with a prominent "My account" headline on the top and a blue "Go to Chegg" button at the bottom.  The "My account" page does not mention cancellation.  Instead, in the middle of the page, in a small print paragraph, Chegg informs subscribers:

> To manage your subscription, update your profile, or to update
> your payments please visit the "My Account" page on Chegg.  You
> may be asked to log in again for security reasons.



45.     Subscribers who click the blue button land on the Overview tab of the account management page on chegg.com.

46.    In many instances, Chegg requires subscribers to sign in again on chegg.com before navigating them to the account management page.  The password requirement is mandatory regardless of whether the subscriber had already signed in on bibme.org.

47.    As described above in Paragraphs 21 to 23, the Overview page does not contain a cancellation link or even mention cancellation.  To proceed with cancellation from this page, subscribers must click on the "Orders" option in the top menu bar or select the BibMe order they wish to cancel.

48.    Clicking one of these options directs consumers to the Orders tab.  Here, Chegg finally provides a small blue "Cancel subscription" hyperlink to initiate cancellation.

49.    Clicking the "Cancel subscription" hyperlink does not complete cancellation. Instead, it launches a small pop-up with a headline "Do you want to cancel your subscription?" above two buttons "No, go back" and "Yes, cancel[.]"

50.    Selecting the "Yes, cancel" button finally completes cancellation of the consumer's BibMe subscription.

51.    To cancel subscriptions on mathway.com, consumers must also navigate a cancellation flow requiring several steps.

52.    For example, consumers must first sign into their account on mathway.com and navigate to the account management page.  On the account management page, consumers need to expand the "Billing" section, which contains several options.



53.     Next, consumers may have to scroll past other options, like "Upgrade Subscription" and "Pause Subscription," to reach the "Cancel Subscription" button.



54.     Clicking the "Cancel Subscription" button does not complete cancellation. Instead, it launches a small pop-up with the text: "We are sorry to see you go! Before you cancel your subscription, if there is an issue we can assist with please contact our support team[.]" Below the text is a green "Confirm Cancellation" button.



55.     However, even clicking "Confirm Cancellation" does not complete cancellation. Instead, it directs consumers to another pop-up with more text about the features they will no longer have access to upon cancellation.  Below the text is another green "Confirm Cancellation" button.



56.     Clicking the second "Confirm Cancellation" button finally completes cancellation of the consumer's Mathway subscription and launches a post-cancellation survey.

57.     In many instances, consumers who navigate Chegg's self-cancellation flows believe they have successfully cancelled their subscription, but Chegg continues to charge them.

58.     Chegg subscribers can also cancel their subscriptions by calling, texting, or messaging with the company's customer service team and requesting cancellation.

59.     In many instances, Chegg also continues to charge consumers who contact its customer service team to request cancellation.

60.    Since October 2020, the company has charged nearly two hundred thousand consumers after they had requested cancellation.

61.    Subscribers whose cancellations do not take effect are forced to restart their attempts to cancel.

62.    Further, because Chegg does not offer the ability to request or obtain a refund of erroneous charges through its self-cancellation flow, such subscribers must contact customer service to stop the charges and request a refund.

63.    In many cases, Chegg refuses refunds or only provides partial refunds to subscribers who continue to be charged after failed cancellation attempts.

### A. Chegg Knows Consumers Have Difficulty Cancelling Their Subscriptions

64.    Chegg has known for years its customers struggle to cancel their subscriptions.

65.    For example, Chegg knows its cancellation practices have generated numerous consumer complaints, including to the Better Business Bureau ("BBB"), state law enforcement agencies, social media, online review websites, and Chegg itself.

66.    The complaints describe a range of difficulties consumers encounter when they attempt to cancel Chegg subscriptions.  For example:

    a.    One consumer emailed Chegg saying: "I have cancelled my subscription multiple times and I am still being charged every month. … I am a college student who cannot afford.  PLEASE FOR THE LOVE OF GOD CANCEL MY SUBSCRIPTION ALREADY."

    b.    Another consumer called Chegg "very tricky" in an email stating: "You guys have been charging me monthly for something I'm no longer using and thought [I] had canceled already.  You guys make it impossible to cancel subscriptions … Frauds!  I want my money back[.]"

67.    Consumers also reported experiencing confusion with Chegg's cancellation flows. For example:

      a.    One consumer reported to the BBB: "[Chegg] charge[d] me for the next month even though I attempted to cancel and it did not work.  How is that fair?  If their website is purposefully designed to confuse people cancelling that is not my fault."

      b.    Another consumer stated: "I requested to cancel my account online and now see that I have been charged for the past several months …. If you hit cancel the subscription, it makes you hit cancel on several screens …. It is misleading and deceptive the way their cancelation process is set up."

      c.    Similarly, another consumer emailed Chegg explaining: "Last month I pressed the cancel button on mobile and was prompted to pause instead of cancel, thinking I already cancelled because of the limited view on my phone I just closed the page thinking it done.  Today I was greeted by a $16.95 charge[.]"  The consumer reported realizing they had not cancelled previously after they went back to cancel, and having to "go through 3 screens with different colored buttons attempting to stop or mislead [their] cancelation."

68.    In addition, consumers complained about difficulties cancelling through Chegg's customer service.  For example:

      a.    One BBB complainant reported: "Impossible to cancel account.  There is no way to cancel subscription online, and it automatically renews.  No way to delete your card so they don't charge you.  Their customer service 'text' line sends you a dead email to email.  Their customer service line does not answer."

b.     Another subscriber emailed Chegg: "I decided to contact costumer support to cancel my subscription as I was paying for a service that I wasn't able to use.  I was told my subscription was successfully canceled and I would not be charged for the next cycle (which started October 17). ... Months later, I have noticed I am still being charged for this subscription even though I was told it was canceled and I have absolutely no access to it. This is extremely frustrating as a college student where 3 months of a Chegg subscription could cost the same as a month of groceries."

69.     Thousands of subscribers who complained to Chegg about their cancellation issues sent emails to danlr@chegg.com—an account Chegg internally refers to as "Letters to Dan."  The name is a reference to Chegg's former CEO, Dan Rosensweig.

70.      Chegg's former COO and current CEO, and other high-level Chegg executives and managers received, shared, and discussed consumer complaints about cancellation sent to Letters to Dan.

71.     For example, in January 2024, one Chegg director explained to other senior managers that: "Problems with cancelling form one of the largest % of Letters to Dan we receive."  He noted this was "definitely evidence that the [user interface] needs some significant work."

72.     Chegg managers also closely track negative public comments, including those regarding consumers' cancellation experiences.  For example, in August 2023, dozens of Chegg employees, including senior leaders and managers, received a monthly "Review Site Tracking" report highlighting that one of the main "Drivers/Themes" in reviews posted on consumer review site Trust Pilot was "being charged after cancelling."

73.     Similarly, in November 2023, a Chegg manager detailed for senior managers findings from social media and customer support contacts reporting "users are vocal about the difficulty they experience when attempting to cancel a subscription.  The way our flows are setup

cause[s] some to believe they've already canceled, to then receive further charges following their initial cancellation attempt."

74.    Chegg's leadership also learned about consumers' cancellation difficulties from a January 2024 Substack article "Problems at Chegg (CHGG)," written by Edwin Dorsey.  Dorsey observed "Chegg has seen growing complaints about its offerings, especially around billing, renewals, and cancellations," and included quotes from several BBB complaints about cancellation difficulties.

75.    Chegg's leadership distributed and extensively discussed Dorsey's article. Chegg's Director of Business Operations, for example, shared the article to "highlight" the sections discussing "difficulty with the cancel flow," and noted, "I see it come up a lot in complaints."

76.     Chegg's then COO and current CEO also shared the article on January 4, 2024, and commented: "Nothing we didn't know / haven't seen."  He then directed Chegg's Vice President of Customer Service to provide numbers on "billing issues" and "a review of our reputational scores."  The vice president reported back to him that eight to ten percent of consumers who cancel every month contact customer service, accounting for over a third of all customer service contacts.  She further noted "commonly report[ed]" issues among these consumers are "[c]anceling in the past and being surprised by continuing charges" and "[f]rustration with the number of pages to cancel."  The vice president also noted that one of "[t]he most common frustrations that drive organic reviews are billing surprises (almost always around difficulty canceling)[.]"

77.    Cancellation problems were indeed already internally well-known at Chegg.  For example, in January 2021, the then President of Learning Services and current CEO asked a few managers to explain why cancellation was "to no real surprise" the number one "contact driver" for Chegg Study and Chegg Study Pack.  The team responded one reason could be that "[c]ancel flows are buried too deep inside MyAccount," and later reported to the President of Learning Services on "patterns in the data" suggesting "MyAccount Cancellation Friction" as a probable

cause. Chegg's management considered but did not adopt a recommendation to make the cancellation link more visible.

78.    Between February 2021 and January 2022, dozens of employees and managers received "weekly digests" about customer service contacts that frequently described self-cancellation as a "common issue" and provided students' comments about difficulty cancelling. On May 27, 2021, for example, the digest noted: "Some students find they are not able to cancel in the Chegg My Account area. We have heard: no order shows up, links redirect elsewhere, the Cancel subscription button is missing, and of course, some of these students may be mobile users."

79.    For many months, between August 2021 and February 2022 and June 2023 and January 2024, several Chegg employees and managers gathered, investigated, and confirmed instances in which consumers continued to get "charged after cancellation[.]"

80.    Around October 2023, Chegg managers were also involved in investigating certain consumer complaints reporting multiple failed cancellations. In a December 19, 2023, meeting, one director suggested "these were likely usability issues" related to the cancellation flow.

81.    Around January 2024, a vice president noted to other managers: "At a high-level, we know the friction in the cancel flow creates situations [that] 'look' like saves on the surface, but instead it's actually users confused by our multiple friction points and confusing [user interface.]"

82.    Despite overwhelming consumer feedback and internal recognition that consumers faced difficulties with Chegg's cancellation flows, the company did not improve the visibility of the cancellation link.

83.    Additionally, the company at times added more steps to some of its cancellation flows. For example, between 2020 and 2024, the company added the coupon, pause, and perks pages to certain flows to reduce cancellations.

84.    As detailed in the below paragraphs, Chegg's then COO and current CEO directed employees to improve retention rates and/or reduce cancellation rates. In April 2023, when the then COO expressed concerns over cancellation rates, a Chegg director updated him on the company's ongoing work on "[i]nterrupting the cancel flow" by adding a perks page, "a step [in] the cancellation flow where we highlight all the features and perks students will be missing out on, leading them to reconsider cancelling."

85.    Another proposed strategy to "interrupt[]" cancellation was to "[m]ake it easier to pause/switch/cancel your cancel request[] [because] sometimes cancelling is not the exact answer a student is looking for."

86.    In November 2022, the then COO now CEO emailed a group of high-level managers saying, "[w]e need to run into [2023] focused on reigniting our acquisition trends. **That means starting right now … pulling levers we can pull weekly to improve our trends**. … we need to be manically focused on quicker levers that will help." (emphasis in original). He then listed several goals Chegg needed to focus on. One of these was, "Retention Rate," and he appointed an employee to be "accountable" for Chegg's retention rate.

87.    In February 2023, Chegg's Director of Business Operations emailed the then COO now CEO to discuss "short term levers we could pull on to help reduce cancellations. We developed a list of MyAccount driven cancel flow saves." These included inserting into the cancel flow "a coupon" and "Driving feature awareness during Online Cancel Flow," referencing the "We're sad to see you go!" screen in the cancellation flow described at Paragraphs 34-35. The then COO now CEO responded to the suggestions with, "We've tried the cancellation flow coupon before. Does that functionality not already exist[] [*sic*]?" and "What I don't get is WHY is this a 1–2-week effort."

88.    Around May 2021, Chegg's current CEO but then President of Learning Services directed employees to make the survey in the cancellation flow mandatory. He called the change "[p]erfect," noting his "POV [point of view] is that [consumers] are canceling, so their [sic]

should be some pain involved, and frankly answering a few questions / or giving some data is not a high bar!"

89.     Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendant is violating or is about to violate laws enforced by the Commission because, among other things, Defendant engaged in its unlawful acts and practices repeatedly over a period of at least three years; Defendant continued its unlawful acts or practices despite knowledge of numerous complaints; and Defendant retains the means, ability, and incentive to continue or resume its pattern of unlawful conduct.

## VIOLATIONS OF THE RESTORE ONLINE SHOPPERS' CONFIDENCE ACT

90.     In 2010, Congress passed the Restore Online Shoppers' Confidence Act, 15 U.S.C. §§ 8401-05, which became effective on December 29, 2010.  Congress passed ROSCA because "[c]onsumer confidence is essential to the growth of online commerce.  To continue its development as a marketplace, the Internet must provide consumers with clear, accurate information and give sellers an opportunity to fairly compete with one another for consumers' business."  15 U.S.C. § 8401.

91.     Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as that term is defined in the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.2(w), unless the seller:  (a) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; (b) obtains the consumer's express informed consent before making the charge; and (c) provides simple mechanisms to stop recurring charges.  *See* 15 U.S.C. § 8403.

92.     The TSR defines a negative option feature as: "in an offer or agreement to sell or provide any goods or services, a provision under which the consumer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer."  16 C.F.R. § 310.2(w).

93.     As described in Paragraphs 1 through 89, Defendant created and manages several negative option features as defined by the TSR, 16 C.F.R. § 310.2(w), including monthly and yearly subscriptions for products and services.

94.     Pursuant to Section 5 of ROSCA, 15 U.S.C. § 8404, a violation of ROSCA is treated as a violation of a rule promulgated under the FTC Act regarding unfair or deceptive acts or practices.

95.     Pursuant to Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of ROSCA constitutes an unfair or deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT I

## Violation of ROSCA—Failure To Provide Simple
## Cancellation Mechanisms

96.     In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as described in Paragraphs 1 through 89, Defendant fails to provide simple mechanisms for a consumer to stop recurring charges for the good or service to the consumer's credit card, debit card, bank account, or other financial account.

97.     Therefore, Defendant's acts or practices as described in Paragraph 96 violate Section 4 of ROSCA, 15 U.S.C. § 8403(3) and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## **CONSUMER INJURY**

98.     Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendant's violations of ROSCA.  Absent injunctive relief by this Court, Defendant is likely to continue to injure consumers and harm the public interest.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff requests that the Court:

A.  Enter a permanent injunction to prevent future violations of the FTC Act and ROSCA;

B.  Award monetary and other relief within the Court's power to grant; and

C.  Award any additional relief as the Court determines to be just and proper.


Respectfully submitted,




Dated:  September 15, 2025                    /s/ Sana Chaudhry

                                              Sana Chaudhry
                                              Eli R. Freedman
                                              Evan Mendelson
                                              Federal Trade Commission
                                              600 Pennsylvania Avenue, NW
                                              Washington DC 20580
                                              (202) 326-2679; schaudhry@ftc.gov
                                              (202) 326-2030; efreedman@ftc.gov
                                              (202) 326-3320; emendelson@ftc.gov

                                              Attorneys for Plaintiff
                                              FEDERAL TRADE COMMISSION